**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert E. Scott, ) | No. CV-09-1584-PHX-NVW |
| ) | |
| Plaintiff, ) | **ORDER** |
| ) | |
| vs. ) | |
| ) | |
| Michael J. Astrue, ) | |
| ) | |
| Defendant. ) | |

Robert Scott challenges the Commissioner's denial of his application for Social Security benefits. On February 9, 2007, Scott filed concurrent applications for Title II and Title XVI benefits, alleging a disability onset date of December 1, 2003. His claims were initially denied on April 26, 2007, and again upon reconsideration on September 25, 2007. A hearing was conducted on October 15, 2008, before an Administrative Law Judge ("ALJ.") The ALJ issued an Unfavorable Decision on April 2, 2009. Scott requested administrative review, but the Appeals Council denied his request on June 4, 2009, rendering the ALJ's decision the Commissioner's final decision. Scott seeks review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

Scott contends that the ALJ: (1) improperly gave more weight to the opinion of a non-examining physician than to that of an examining physician; (2) failed in his duty to fully develop the record by rejecting Scott's request to subpoena the examining physician; (3) erred in his evaluation of lay witness statements and failed to provide legitimate reasons for rejecting lay testimony; (4) erred in finding that Scott did not meet Listing

12.04 and Listing 12.08; and (5) erred in finding that Scott was capable of performing other work. For the reasons stated below, the Court will remand this case to the Commissioner for additional administrative proceedings.

**I.  Background**

Scott was thirty-five years old when applied for Social Security benefits. He attended high school through the tenth grade and obtained his General Equivalency Diploma through Central Arizona College. His work history is spotty. From 1993 to 1994, he did retail sales. From 1996 to 1999, he worked on and off for a temporary job agency. In 1999, he had a job driving a forklift. At some point after that, he worked as a restroom attendant at a casino for about a year and a half. He quit that job after getting into an argument over whether he could park in a shady spot while his windshield was being repaired. He last worked "under the table" in 2006, after the alleged onset of his disability, driving motor homes that had been purchased at auctions and delivering them to people in New Mexico and California. He left that job after getting into an argument.

In addition to having various odd jobs, Scott served in the Army for about six months sometime in 2001. In early April of that year, the Army sent him to a counselor for a mental health evaluation. His commander noted that Scott was "very angry," had gotten into two fights with other soldiers, and had threatened physical harm to others and to himself. The commander called Scott's father who indicated that Scott had a "history of anger." Scott's counselor concluded that Scott could not "adapt to military service due to anger [management] problem[s]," and that Scott posed "an ongoing safety risk." Scott was discharged shortly thereafter for disruptive behavior.

Scott first saw Dr. Burrell, D.O., a family practice doctor at Green Field Family Medicine, on September 1, 2004. Scott described problems with anger, mood swings, and lack of concentration going back to his childhood. Dr. Burrell noted that Scott was just getting off drugs, and that he had been using "speed" because it purportedly helped him to concentrate. Scott reported that his moods were mostly down and angry. He had

trouble finishing things and reading, and had continual relationship problems. Dr. Burrell's initial diagnosis was Attention Deficit Disorder with depression and possible bipolar disorder, for which he prescribed Wellbutrin.

The following week, Scott was admitted to the Banner Baywood Medical Center after overdosing on his newly prescribed medication. He was interviewed by Erica VanDerHeyden, Psy.D. Dr. VanDerHeyden noted that Scott's tone was somewhat flat and his affect was inappropriate at times. His personality presentation suggested "schizotypal features." His mood appeared to be depressed and his affect was blunted. His insight and judgment were thought to be poor. His attention, concentration, and memory, however, were adequate for the interview. Scott denied being suicidal. Dr. VanDerHeyden wrote that she had spoken with Scott's father, who said that Scott had problems with anger outbursts all of his life. Dr. VanDerHeyden diagnosed Scott with "intermittent explosive disorder" and Attention Deficit Hyperactivity Disorder by history.

On September 10, 2004, Scott went back to Dr. Burrell, who diagnosed him with bipolar disorder. Dr. Burrell changed Scott's medication from Wellbutrin to Lithium Carbonate. Although Dr. Burrell's notes are extremely concise, it appears that from October 22, 2004, through December 12, 2006, Scott did well on Lithium. On October 22, 2004, Dr. Burrell wrote that Scott "fe[lt] better" and that he "seem[ed] more up [and] stable." On January 14, 2005, Dr. Burrell noted that Scott's moods were good and "awesome," that Scott had a new girlfriend, and that Scott had "no arguments" and "no suicide thoughts." On May 19, 2005, Dr. Burrell wrote that Scott was "doing great on [four] lithium." Dr. Burrell's notes for December 12, 2006, do not discuss Scott's mental state and only say that Scott was still taking Lithium. There appear to be no notes documenting Scott's condition between December 12, 2006, and June 2007.

On April 17, 2007, Scott was examined by psychologist Shelley K. Woodward, Ph.D., at the request of Disability Determination Services ("DDS.") Her evaluation was based upon a clinical interview, a mini mental state examination, and records provided by

DDS. She noted that Scott "dressed casually, but appropriately" for the appointment, but that his "hygiene, grooming, and dentition appeared to be compromised." Scott was "malodorous" and his nails were dirty. His affect was somewhat labile, with irritation and inappropriate laughter at times.

Scott told Dr. Woodward that he was seeking disability benefits because of problems related to being "Bipolar type I," for which he took four Lithium pills every night. Dr. Woodward noted that Scott was receiving benefits from Arizona's Medicaid agency, the Arizona Health Care Cost Containment System ("AHCCS,") but his Lithium prescription was apparently not covered because Dr. Burrell was not an AHCCS physician. Scott's parents were paying for his medications. Scott also told Dr. Woodward that he had been ordered to apply for disability benefits by a state court, or else he would be sent to jail for not paying child support.

Scott related that he began threatening people when he was between ten and thirteen years old, and that he often had outbursts of anger. In a typical day, he could have significant mood swings. He had days when he became "violent and nasty." Although his father had cancer, Scott nevertheless would "holler and scream at him," while he got along with his mother "alright." Scott had always lived with his parents, and usually spent the day helping his father or working on toy models of aircraft, ships, submarines, or Star Trek reproductions. He also checked e-mail during the day and participated in an internet forum for "model guys." Dr. Woodward noted that Scott had suicidal ideation consistently, but with no current intention.

Dr. Woodward opined that Scott's fund of knowledge was below average. Scott's verbal IQ was 76, his performance IQ was 90, and his full scale IQ was 80. The scores suggested that Scott performed in the low average range of intelligence. On the other hand, Scott's short term, intermediate, and remote memory processes appeared intact. Scott was alert, his eye contact was good, and he was generally cooperative during the evaluation.

Dr. Woodward conducted a Medical Source Statement of Ability to Do Work Related Activities. She concluded that Scott was markedly limited in three domains: (1) his ability to work in coordination with or proximity to others without being distracted by them; (2) his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (3) his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.

Dr. Woodward concluded that Scott appeared to meet the criteria for Bipolar I disorder, with active symptoms, including a lengthy history of mood swings with periods of persistently elevated and irritable mood. Scott had a lengthy pattern of violation of the rights of others, beginning in late childhood. He demonstrated impulsivity, irritability, and aggressiveness, consistent irresponsibility to occupational duties, and apparent lack of remorse regarding his behavior towards others. Dr. Woodward noted that Scott had been discharged from the Army for fighting and for threatening to shoot himself. She opined that those behaviors were present even when Scott was not in the midst of a manic episode, and therefore Scott met the criteria for an Antisocial Personality Disorder. Dr. Woodward believed that if Scott were awarded disability benefits, he would not be capable of managing them on his own behalf.

In late April 2007, Stephen Bailey, Ed.D., a state agency medical consultant with a medical specialty in the area of psychology, was asked to review the record. He opined that there was insufficient evidence to conclude that Scott met Listing 12.04 for Affective Disorders or Listing 12.08 for Personality Disorders. In a Psychiatric Review Technique form, he checked that Scott was moderately limited in his social functioning and markedly limited in his ability to maintain concentration, persistence, or pace.

In his notes, Dr. Bailey opined that Scott met the "criteria for having two marked domains," specifically concentration, persistence and pace, and socialization. He stated that Scott's main difficulty was "what has been diagnosed as an Antisocial Personality disorder," and that Scott had "the history of poor social interactions, rife with physical

altercations, firings due to same, impulsive explosiveness, harming animals during fits of anger, etc. etc. etc., by his report."

Dr. Bailey went on to conclude, however, that Scott "demonstrated no actual signs of Antisocial Personality Disorder, other than poor hygiene," and "no actual signs of Bipolar Disorder." He stated that, "everything is based on hearsay, his, of how ornery he is, how angry he is, how many times he's been fired and why, and what not to do when you're around him, so that you don't make him angry and thereby incur his wrath." Dr. Bailey felt that Scott was "bullying his way into SSI benefits." He noted that Scott reported being referred for his benefits application "due to his oweing back child support, and not having a way to pay for it," and that Scott had "shown the capacity in the past to do work, to stay on the job, and to find other work." Dr. Bailey concluded that Scott could "understand, remember, and carry out simple instructions," and could "make decisions commensurate with the function of unskilled work." In his opinion, Scott "should be able to deal with a low social environment setting, and deal effectively with changes in a routine work setting." Dr. Jack A. Marks, M.D., a state agency psychiatrist, summarily concurred with Dr. Bailey in a one paragraph report after reviewing the record. He stated that, "clmt s/be able to perf. his past wk in housekeeping."

On June 20, 2007, Scott went back to Dr. Burrell, who wrote that, for Scott, Lithium "work[ed] good for the most part." Scott told Dr. Burrell that he was "having a few psychotic dreams about shooting," that he could not sleep until one or two a.m., and that the dreams became worse when he was angry. In July 2007, Scott told Dr. Burrell that he had been moving and the stress of the move triggered an "episode" during which he had "lost it." Scott's mother later explained that Scott had picked up his television, which was "a big one," and had thrown it down the hallway.

In addition to considering Scott's medical and work history, as outlined above, the ALJ heard the testimony of Scott and his mother, considered letters supplied by Scott's acquaintances, and heard the testimony of a vocational expert. Scott testified about his

work history and medical condition.  His mother testified that although Scott could be very loving, little things could set him off.  She mentioned that she was able to get along with Scott better since he was prescribed Lithium, but that "he's still never going to be the same," and that Scott scared her at times.  She also described the moving incident during which Scott threw his television down the hallway.

Bob and Debi Ranking prepared a statement dated May 24, 2007.  They had known Scott for fifteen years, and in their opinion, he was an unstable individual.  At one point they employed him as a janitor, but Scott's poor attendance and moodiness was such a cause for concern that they fired him.

Leslie Oable prepared a letter dated May 29, 2007.  She stated that she had known Scott for approximately twelve to fourteen years.  She noted that Scott had difficulty keeping a job and that he "fl[ew] off the handle at the least little thing."

Dale Dwight prepared a letter dated May 15, 2007.  Dwight became acquainted with Scott in the late 1980s.  At that time, Scott's father worked for Dwight as an RV service manager.  Dwight stated that, "Several times [Scott] was a very pleasant young man and a capable worker, however his personality could change in a matter of minutes to become extremely agitated and combative.  After several occasions of mood swings and subsequent confrontations I was compelled to ask him to leave the premises and not return."

Finally, the ALJ also heard the testimony of a vocational expert.  The vocational expert reviewed Scott's file and heard the testimony of Scott and his mother.  The ALJ posed the hypothetical of a thirty-seven year old person, with a high school equivalency degree, assuming the person could engage in a "medium" level of exertion, but would not be required to lift more than fifty pounds on occasion and up to twenty-five pounds on a frequent basis.  The job performed by such a person would be unskilled and there would be no requirement of interaction with the public–the person would work with things, not with people.  Coworkers could be present, but the person would not be required to

interact with them in order to do the job. The vocational expert responded that there were several occupations that met those requirements, including packager, assembly worker, and janitor.

On cross-examination by Scott's lawyer, the vocational expert admitted that, even in those jobs, there would be some contact with supervisory personnel, and that almost all of them would have some reviews, production quotas, and standards that needed to be adhered to. Scott's lawyer then asked, "And with regards to the testimony [of the claimant] and some of the other evidence we discussed, I mean assuming that that's all accepted as true do you think that this gentleman would be employable in any job?" The vocational expert answered, "No."

Scott's lawyer then requested that the ALJ subpoena Dr. Woodward. He argued that the only medical evidence that appeared to contradict her opinion regarding the severity of Scott's condition was Dr. Bailey's report, and Dr. Bailey had not considered all of the evidence that was developed during the hearing. The ALJ responded that he did not have the authority to subpoena, and nevertheless his position was that Dr. Woodward's comments were clear and did not require elaboration.

## II. Standard of Review

The Court will disturb a denial of benefits only if the decision "contains legal error or is not supported by substantial evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). The substantial evidence standard is somewhere between a scintilla and a preponderance. *See Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997) (per curiam). Under this standard, "[w]here evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (internal quotations omitted). An ALJ's decision will not be

reversed for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential. *Id*.

**III.    Analysis**

The Social Security Act defines "disability" as the inability to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). An ALJ applies a five-step sequential review process in determining whether a claimant is disabled. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009). If the ALJ determines that the claimant is disabled or not disabled at any step, the ALJ does not continue to the next step. *Id*. The five step process entails the following.

At step one, is the claimant engaging in substantial gainful activity? If so, the claimant is not disabled. *Lester v. Chater*, 81 F.3d 821, 828 (9th Cir. 1995). If not, proceed to step two. *Id*. At step two, does the claimant have a severe impairment? *Id*. If so, proceed to the next step. *Id*. If not, the claimant is not disabled. *Id*. At step three, does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? *Id*. If so, the claimant is automatically found to be disabled. *Id*. If not, proceed to step four. *Id*. At step four, is the claimant capable of performing his past work? *Id*. If so, the claimant is not disabled. If not, proceed to step five. *Id*. At step five, does the claimant have the residual functional capacity to perform any other work? *Id*. If so, the claimant is not disabled. *Id*. If not, the claimant is disabled. *Id*. "The burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five." *Bray*, 554 F.3d at 1222.

It is undisputed that Scott has not engaged in substantial gainful activity since December 1, 2003, the alleged onset date of hisdisability. The parties also do not contest the ALJ's finding that Scott has a combination of impairments, namely bipolar disorder

and antisocial personality disorder, that are "severe." Scott contends, however, that the ALJ improperly weighed the medical evidence and lay testimony in the record, which tainted the ALJ's finding that Scott did not satisfy a Listing at step three. The parties do not contest the ALJ's determination at step four that Scott cannot perform his past work. Scott contends that the ALJ erred at step five in finding that Scott had the functional capacity to perform other work.

### A. Medical Evidence

As a general rule, more weight should be given to the opinion of a treating source than to the opinions of doctors who do not treat the claimant. *Lester*, 81 F.3d at 830. Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for clear and convincing reasons. *Id.* If the treating doctor's opinion is contradicted by another doctor, the treating doctor's opinion may not be rejected without specific and legitimate reasons supported by substantial evidence in the record for doing so. *Id.* However, the opinion of a physician, including a treating physician, need not be accepted, "if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bray*, 554 F.3d at 1228.

The opinion of an examining physician is, in turn, entitled to greater weight than that of a non-examining physician. *See Lester*, 81 F.3d at 830. As with a treating physician, there must be clear and convincing reasons for rejecting the uncontradicted opinion of an examining doctor. *Id.* The opinion of an examining doctor, if contradicted by another doctor, can only be rejected for specific and legitimate reasons supported by substantial evidence in the record. *Id.*

The opinion of a non-examining doctor cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician. *Id.* at 831. Rather, there must be other evidence in the record that supports a decision to reject an examining physician or a treating physician's conclusions. *See id.* at 830-31.

In this case, the ALJ found the opinion of Dr. Bailey, a non-examining physician, to be persuasive, and accorded less weight to the opinion of Dr. Woodward, an examining physician. The ALJ reasoned that most of the symptoms in the record were based on Scott's self-reported problems, as stated by Dr. Bailey. Also, the diagnosis of Scott's treating doctor, Dr. Burrell, did not indicate the extent of limitations alleged by Scott. The ALJ stated that the tenor of Dr. Burrell's notes suggested that Scott was doing relatively well over a period of three years. In contrast, Dr. Woodward examined Scott "only once." The ALJ concluded that Dr. Burrell's diagnosis was more consistent with Dr. Bailey's report than with Dr. Woodward's.

Dr. Burrell's notes for the period of October 22, 2004, through December 12, 2006, are short and conclusory. It is difficult to tell from the notes whether Dr. Burrell's comments noting that Scott was "doing well" meant that Scott was doing better than when he attempted to commit suicide, but was still experiencing symptoms associated with his bipolar disorder, or whether Dr. Burrell meant that Scott was essentially asymptomatic. However, the ALJ's conclusion that Dr. Burrell's notes tended to show that Scott's condition had stabilized is rational and plausibly supported by the record, and must therefore be upheld. *See Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (the ALJ's conclusion must be upheld where the evidence is susceptible to more than one rational interpretation).

However, this does not end the inquiry because, unlike Dr. Woodward and Dr. Bailey, Dr. Burrell never opined whether Scott nevertheless had an impairment that limited his ability to work. In fact, in this respect, Dr. Woodward's opinion appears to be more consistent with Dr. Burrell's notes than Dr. Bailey's. Dr. Bailey opined that Scott did not exhibit any of the symptoms of bipolar disorder. In contrast, Dr. Burrell continually noted that Scott was bipolar, and prescribed Lithium to treat that condition for over three years. The ALJ also found at step two that Scott had bipolar disorder.

Dr. Bailey's notes are also inconsistent with the information he included in the Psychiatric Review Technique form. Dr. Bailey checked that Scott was markedly limited in his ability to maintain concentration, persistence, and pace, and moderately limited in his ability to function socially. In contrast, in his notes, Dr. Bailey stated that Scott met the criteria for having two marked domains, including concentration, persistence, and pace, and socialization. However, after stating that Scott met the criteria for two marked domains, Dr. Bailey concluded that there were "no actual signs of a mental condition."

Dr. Bailey's statement that "everything" Scott claimed was "based on hearsay" is also unreliable. There is evidence in the record from external sources, such as the records of Scott's discharge from the Army, Dr. VanDerHeyden's evaluation after Scott's attempted suicide, and the testimony of Scott's friends and family, that corroborates Scott's claims. The ALJ accepted Dr. Bailey's conclusion that Scott was "bullying his way into SSI benefits" over Dr. Woodward's conclusions without addressing any of the weaknesses in Dr. Bailey's report. The ALJ did note that Dr. Marks concurred with Dr. Bailey's opinion. However, Dr. Marks's report was conclusory, consisting only of one paragraph, and Dr. Marks's opinion that Scott could perform his prior work was contrary to the ALJ's own finding that Scott could not perform his past work.

In contrast, Dr. Woodward's belief that Scott suffered from bipolar disorder is consistent with Dr. Burrell's diagnosis. Dr. Woodward considered all of the evidence that was then available, including the evidence that corroborated Scott's claims. Her report is significantly more comprehensive and better reasoned than Dr. Bailey's. And, although Dr. Woodward saw Scott only once, the ALJ could not, for that reason, give less weight to her opinion than to that of Dr. Bailey, a non-examining physician. *See Lester*, 81 F.3d at 832.

On the other hand, Dr. Woodward's report is potentially inconsistent with Dr. Burrell's notes in some respects. For example, Dr. Woodward stated that Scott "had suicidal ideation consistently, but no current intention," while Dr. Burrell in January 2005

1 wrote that Scott "had no suicide thoughts." In addition, Scott's statements to Dr. Woodward appear to suggest that his condition never improved, whereas Dr. Burrell's notes for the period of October 22, 2004, through December 12, 2006, suggest that Scott's moods were relatively stable and under control.

Scott contends that the ALJ should have subpoenaed Dr. Woodward to give her an opportunity to clarify her conclusions. While the ALJ incorrectly believed that he did not have the authority to subpoena Dr. Woodward, his second ground for denying the request–that Dr. Woodward's comments were clear and did not require elaboration–independently supported his decision to not subpoena Dr. Woodward. A claimant is entitled to "such cross-examination as may be required for a full and true disclosure of the facts." *See Solis v. Schweiker*, 719 F.2d 301, 302 (9th Cir. 1983) (quoting 5 U.S.C. § 556(d)). The ALJ has discretion to decide when cross-examination is warranted. *Copeland v. Bowen*, 861 F.2d 536, 539 (9th Cir. 1988). Scott was not denied the opportunity to cross-examine a witness whose findings contradicted medical evidence that was favorable to him. *See Solis*, 719 F.2d at 302 (it was an abuse of discretion to deny claimant's request to cross-examine a state agency physician who rendered an adverse medical opinion where the physician's report was crucial to the ALJ's decision). Instead, Scott took the position that Dr. Woodward's report supported his claims, rendering his argument that cross-examination was necessary less compelling. Further, Dr. Woodward's report set forth in great detail the reasons underlying her conclusions. The ALJ believed that he fully understood those reasons. Under those circumstances, it was not an abuse of discretion for the ALJ to deny the subpoena.

While the ALJ was not required to subpoena Dr. Woodward, his reasons for rejecting Dr. Woodward's report in favor of Dr. Bailey's are unpersuasive. This is an unusual case in that the treating physician, Dr. Burrell, did not opine whether Scott could work, and therefore the reports of Dr. Woodward and Dr. Bailey were crucial to the disability determination. As explained, Dr. Bailey's report was internally inconsistent

- 13 -

and his conclusions were contrary to some of the ALJ's findings and medical evidence in the record. Because the ALJ failed to explain why Dr. Bailey's opinions nevertheless warranted adoption, it was error for the ALJ to discount Dr. Woodward's report in favor of Dr. Bailey's.

The dismissal of Dr. Woodward's report is also of particular consequence because her report arguably supported a finding that Scott met Listing 12.04 and, possibly, Listing 12.08. To meet Listing 12.04 or 12.08, a claimant must meet the specific requirements of the "A" criteria of the listing. *See* 20 C.F.R. pt. 404, subpt. P. app. 1, §§ 12.04, 12.08. The claimant must also establish the required level of severity, which can be done by showing that the claimant satisfies paragraph "B" of the listing, or paragraph "C," in the case of Listing 12.04. *See id*. The Commissioner acknowledges that Scott probably satisfied the specific requirements of paragraph "A" criteria–demonstrating the presence of a depressive syndrome or a personality disorder. The Commissioner contends, however, that Scott did not establish two of the four "B" criteria, as required to show the requisite level of severity.

In order to meet the paragraph "B" criteria, a claimant must show at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. Dr. Woodward opined that Scott had "marked limitations" in social functioning; specifically, the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. Dr. Bailey opined that Scott also met the criteria for having marked difficulties in maintaining concentration, persistence or pace, and Dr. Woodward opined that Scott was markedly limited in his ability to work with others without being distracted by them. That evidence, if believed, tends to support Scott's claim that he satisfies at least two of the four "B" criteria.

- 14 -

Scott also claims that the record supports the conclusion that he satisfies the paragraph "C" criteria of Listing 12.04. To satisfy paragraph "C," a claimant must show a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of the ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support. The claimant must also show: (1) repeated episodes of decompensation of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Scott asserts that it is undisputed that his affective disorder has lasted over two years, and that the ALJ found that it caused more than minimal limitations in his ability to do basic work-like activities. Dr. Woodward's report could have supported the conclusion that Scott satisfied at least one criteria of Paragraph "C." Dr. Woodward found that Scott had a lengthy history of mood swings with periods of persistently elevated and irritable mood. However, the ALJ did not discuss this in his opinion. Instead, he concluded without discussion or explanation that Scott did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R., Pt. 404, Subpt. P, App.1. The ALJ's failure to explain this conclusion was in error.

**B.     Scott's Testimony**

For the ALJ to reject a claimant's complaints, the ALJ must provide "specific, cogent reasons for the disbelief." *Lester*, 81 F.3d at 834 (citation omitted). Once the claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence. *Id.* Unless there is affirmative evidence that the

1  claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be
2  clear and convincing. *Id*.

3  There is no evidence in the record that Scott was malingering. The ALJ noted that
4  Scott applied for disability benefits because he was ordered by a state court to apply for
5  benefits or be sent to jail because of owed child support. However, this does not
6  necessarily imply that Scott was lying. Dr. Woodward knew that Scott was ordered to
7  apply for benefits by a state court but nevertheless concluded that Scott was cooperative
8  during his interview and that he put forth an adequate effort. The ALJ himself never
9  concluded that Scott was malingering. Therefore, the ALJ could only reject Scott's
10 testimony for clear and convincing reasons.

11 General findings are insufficient to discredit a claimant's testimony; rather, the
12 ALJ must identify what testimony is not credible and what evidence undermines the
13 claimant's complaints. *Id*. The ALJ must make a credibility determination with findings
14 sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily
15 discredit the claimant's testimony. *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir.
16 2002). The ALJ may consider the following factors in weighing the claimant's
17 credibility: the claimant's reputation for truthfulness, inconsistencies in the claimant's
18 testimony or between his testimony and his conduct, the claimant's daily activities, the
19 claimant's work record, and testimony from physicians and third parties concerning the
20 nature, severity, and effect of the symptoms of which the claimant complains. *Id*. at 958-
21 59.

22 The ALJ rejected Scott's testimony because the medical records did not support
23 Scott's allegations. Scott's testimony was generally consistent with Dr. Woodward's
24 conclusions. But the ALJ improperly discounted Dr. Woodward's report and gave greater
25 weight to that of Dr. Bailey, which contained several inconsistencies. Because the ALJ
26 improperly weighed the medical evidence in the record, the conclusion that Scott's
27 testimony was unsupported by the medical records is unreliable.

28

1    The ALJ also concluded that Scott's ability to drive, use the computer, and build
2    models undermined his testimony because his performance of those tasks showed that
3    Scott was goal-oriented and capable of engaging in tasks. However, the mere fact that a
4    claimant carries on certain daily activities does not detract from the claimant's credibility
5    as to his overall disability. One does not need to be utterly incapacitated to be disabled.
6    A claimant's ability to engage in activities that are not transferable to a work setting with
7    regard to the impact of the claimant's disability does not undermine the claimant's
8    credibility. *See Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). Scott's claim
9    for disability is generally premised on his inability to maintain socially appropriate
10   behavior and interact with others in a work environment. The fact that he uses the
11   computer, can drive, and builds models does not undermine his claim or detract from his
12   credibility.

### C.    Lay Witness Evidence

14       Lay testimony as to a claimant's symptoms is competent evidence that an ALJ
15   must take into account, unless the ALJ expressly determines to disregard such testimony
16   and gives reasons germane to each witness for doing so. *Lewis v. Apfel*, 236 F.3d 503,
17   511 (9th Cir. 2001). The ALJ found Ms. Scott's testimony to not be fully credible
18   concerning the severity and extent of Scott's limitations. The ALJ explained that Scott's
19   mother had testified that Scott's moods changed rapidly, that she was afraid of Scott, that
20   Scott did not like to listen to people, and that Scott was very strong when he became
21   angry. The ALJ discredited her testimony because the medical records from Dr. Burrell
22   did not show very serious problems or limitations, and because Scott's daily activities,
23   including using the computer and building model airplanes, did not suggest that Scott was
24   as limited as she claimed. Scott's ability to use the computer and build models does not
25   suggest that his moods do not change rapidly or that Scott does not like to listen to
26   people. On the other hand, the ALJ may discount lay testimony if it conflicts with
27   medical evidence. *Lewis*, 236 F.3d at 511. Although Dr. Burrell's notes are short and

1  conclusory, it was not unreasonable for the ALJ to interpret them to mean that Scott's
2  moods had stabilized. In this regard, Ms. Scott's testimony appears to be inconsistent
3  with at least some of the medical evidence in the record. The ALJ therefore gave a
4  legitimate reason for according less weight to Ms. Scott's testimony.

5  The ALJ's reasons for disregarding the statements of the Rankins, Oable, and
6  Dwight are much less convincing. These individuals testified that Scott had difficulty as
7  an employee with moodiness and poor attendance, that he flew off the handle at "any
8  little thing," and that he had severe mood swings. The ALJ found that their observations
9  were consistent with Dr. Bailey's statement that Scott was "bullying his way into SSI
10  benefits," and noted that Scott was thought at times to be a "very pleasant young man and
11  a capable worker." The ALJ did not explain, however, why these witnesses' statements
12  "were consistent with" the observation that Scott was bullying his way into SSI benefits.
13  There is nothing in the record to suggest that these witnesses had any reason to lie or to
14  exaggerate. There is also nothing in the record suggesting that Scott was feigning his
15  symptoms in order to obtain benefits. The ALJ took Dwight's statement that Scott could
16  be a "very pleasant young man and a capable worker" out of context. Dwight testified
17  that, "Several times [Scott] was a very pleasant young man and a capable worker,
18  however his personality could change in a matter of minutes to become extremely
19  agitated and combative." That statement supports, rather than undermines, Scott's claim
20  that he suffers from unpredictable mood swings that impair his ability to work. The
21  ALJ's reasons for rejecting the testimony of these witnesses were therefore illegitimate.

### D. Vocational Expert

23  It is the Commissioner's burden, at step five, to show that the claimant has the
24  residual functional capacity to perform substantial work. *Bray*, 554 F.3d at 1222. The
25  ALJ found, based on the testimony of the vocational expert, that although Scott could not
26  perform any of his past relevant work, based on Scott's age, education, work experience,
27  and residual functional capacity, Scott could perform the requirements of jobs such as

1  packager, assembler, and janitor. However, in response to cross-examination by Scott's
2  lawyer, the vocational expert admitted that someone with the limitations alleged by Scott
3  would not be able to perform any job in the economy.
4        The ALJ did not attempt to resolve the apparent contradiction in the vocational
5  expert's testimony. The Court can only surmise that the ALJ discredited all of Scott's
6  favorable evidence. However, the Court has already determined that some of that
7  evidence was rejected in error. As a result, the vocational expert's responses cannot be
8  determinative, and the ALJ should have, at a minimum, requested that the vocational
9  expert clarify his responses in order to fully develop the record. The Commissioner
10 therefore did not meet his burden to show that Scott had the residual functional capacity
11 to perform the jobs described by the vocational expert.

## IV. Remedy

The choice of whether to reverse and remand for further administrative proceedings, or to reverse and simply award benefits, is within the court's discretion. *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989). Generally, when a court reverses an administrative determination, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004).

The court may award benefits when no useful purpose would be served by further administrative proceedings and the record has been thoroughly developed. *Vertigan*, 260 F.3d at 1053. Remand is appropriate where additional proceedings would remedy defects in the ALJ's decision, and where the record should be developed more fully. *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990). Where the Commissioner is in a better position than the court to evaluate the evidence, the court should remand for further proceedings. *Id*. In light of the conclusory nature of the notes from Scott's treating physician, the inconsistencies in Dr. Bailey's report, the ALJ's failure to ask the vocational expert to explain the apparent contradictions in his testimony, and the ALJ's

failure to properly weigh Scott's testimony and the evidence provided by lay witnesses, the Court will remand to the Commissioner to fully and fairly develop the record and determine whether Scott qualifies for benefits.

IT IS THEREFORE ORDERED that judgment be entered vacating the decision of the Commissioner denying benefits and remanding this matter for further administrative proceedings consistent with this Order. The Clerk shall terminate this action.

DATED this 8th day of June, 2010.

_____
Neil V. Wake
United States District Judge